■ BETH GARNETT, Respondent, v STRIKE HOLDINGS LLC et al., Appellants, et al., Defendants. (And a Third-Party Action.) [15 NYS3d 786]—

Order, Supreme Court, New York County (Milton A. Tingling, J.), entered July 23, 2013, which denied defendants Strike Holdings LLC and Strike Long Island, LLC's motion for summary judgment dismissing the complaint, unanimously reversed, on the law, without costs, and the motion granted. The Clerk is directed to enter judgment dismissing the complaint as against the moving defendants.

Facts

Defendants Strike Holdings LLC and Strike Long Island, LLC (collectively, Strike) operated an indoor recreation facility that contained a go-kart racing track. On December 27, 2003, plaintiff rode as a passenger in a two-seat go-kart driven by her then boyfriend, third-party defendant, Lawrence Nadler. While driving on the track, they were allegedly bumped twice by other go-karts, allegedly causing injuries to plaintiff, including "Reflex Sympathetic Dystrophy."

Plaintiff commenced this action against Strike alleging causes of action for negligence, negligent and defective design, strict products liability, failure to warn, and breach of warranty. This Court affirmed the denial of Strike's CPLR 3211 motion, declining to dismiss the products liability claim on the ground that Strike's leasing and rental of the go-karts could support the inference that Strike had placed the go-karts within the distributive chain, and finding that Strike's waiver form purporting to contain an "express assumption of risk, waiver, indemnity and agreement not to sue" was void as against public policy and unenforceable by reason of General Obligations Law § 5-326 (*Garnett v Strike Holdings LLC*, 64 AD3d 419, 420 [2009]).

The parties then conducted discovery. At her deposition plaintiff testified that on December 27, 2003, she was 5'5" tall and weighed approximately 130 pounds. She was strapped into the passenger seat of the two-seater go-kart by a shoulder and lap belt. Plaintiff discerned no difference between her seat and that of the driver, her then boyfriend, Lawrence Nadler. Dur-

ing the first lap of the race, plaintiff noticed that Nadler was driving very fast and that the other racers were speeding as well. She said she felt uncomfortable with the speed, and tried to communicate to Nadler to "[m]ake them stop," but Nadler replied that he was unable to pull over. Plaintiff was unsure of their go-kart's rate of speed, estimating it at between 10 and 25 m.p.h.

A few minutes into the race, plaintiff said, her go-kart was bumped by another racer. After the first bump, she yelled and "made eye contact" with Strike staff to communicate that the go-karts were going very fast. A few minutes later, her go-kart was bumped again. She did not know if it was by the same driver. Following the second bump, she experienced pain in her entire body. The race continued after the second bump, and Nadler finished the race although plaintiff told him that she was hurt and wanted to get off. Plaintiff said that she and Nadler then left the premises, without complaining to Strike staff about plaintiff's experience.

Lawrence Nadler testified at his deposition that the go-kart that he and plaintiff were driving in was bumped several times over a period of a few minutes, but he characterized the force of the bumps as a "light impact" and said that he accelerated to get away from those other go-karts. He said that he was driving carefully, not erratically, keeping his go-kart steadily on the track. He believed that he could not pull over to the side because if he did, his go-kart would have been hit harder. Nadler was focused on driving, and did not observe whether plaintiff made any gestures to the operator. After the race, Nadler said, plaintiff told him that her right foot was injured in the kart, and a Strike employee brought over ice for plaintiff's foot and was told about the incident.

Joshua Silverstein, Strike's general manager, explained that the go-karts were powered by electricity and controlled by a remote control with four different speed settings. He stated that as a general matter, it was Strike's policy to stop the go-karts if bumping occurred, and to have the attendant walk over to the go-kart that was doing the bumping and tell the driver to stop. If the bumping occurred again, the race was to be stopped. It was Strike's general policy to have four people working the go-kart track, one to seat people in the go-karts, one to run the control panel, and two to monitor the race on opposite sides of the track where the turns were located. In the center of the track were the operator and the remote control box by which the speed of the go-karts could be controlled. The operator's position did not allow a simultaneous view of the

entire track so as to allow the operator to see all bumping incidents. Silverstein confirmed that the pit area was closed off during races so that the go-karts could not exit the track while the race was in progress.

## The Motion for Summary Judgment

Following discovery, Strike moved for summary judgment dismissing the complaint. Strike argued that as a mere licensee of the go-karts, it did not manufacture, sell, design, produce or distribute the go-karts and could not be held liable in strict products liability, breach of warranty, or defective design, and that, in any event, there was no evidence of any design defect. Strike further argued that plaintiff assumed the risk of a voluntary recreational activity by participating in the go-kart race, and that she failed to show that Strike was negligent or breached any duty it owed her.

The motion court denied summary judgment. We now reverse.

## Assumption of Risk

Although Strike may not avoid liability based on the written waiver it asks its customers to sign, the common-law assumption of risk doctrine is nevertheless applicable. This doctrine applies to "certain types of athletic or recreational activities," where "a plaintiff who freely accepts a known risk 'commensurately negates any duty on the part of the defendant to safeguard him or her from the risk' " (*Custodi v Town of Amherst*, 20 NY3d 83, 87 [2012]). While "participants are not deemed to have assumed risks resulting from the reckless or intentional conduct of others, or risks that are concealed or unreasonably enhanced" (*Custodi* at 88), the concept of a "known" risk includes "apparent or reasonably foreseeable" risks inherent in the activity (*id.*, quoting *Benitez v New York City Bd. of Educ.*, 73 NY2d 650, 657 [1989]).

The activity in which plaintiff engaged is a type to which the assumption of risk doctrine is appropriately applied. "In riding the go-cart, the plaintiff . . . assumed the risks inherent in the activity" (*Loewenthal v Catskill Funland*, 237 AD2d 262, 263 [2d Dept 1997], citing *Murphy v Steeplechase Amusement Co.*, 250 NY 479 [1929]). Those risks included the risk "that the go-cart would bump into objects" (237 AD2d at 263). Of course, the "apparent or reasonably foreseeable" risks inherent in go-karting also include the risk that vehicles racing around the track may intentionally or unintentionally collide with or bump into other go-karts. It is that inherent risk which "negates any duty on the part of the defendant to safeguard [plaintiff] from the risk" (*Custodi*, 20 NY3d at 87).

While the application of the assumption of risk doctrine in *Treacy v Castle Fun Ctr.* (120 AD3d 1405 [2d Dept 2014]) was based on the added known risk created by a specially treated "slick track" go-karting track, the Court's analysis recognized that "by engaging in a sport or recreational activity, a participant consents to those commonly appreciated risks which are inherent in and arise out of the nature of the sport generally and flow from such participation" (*id.* at 1406 [internal quotation marks omitted]). It cannot be reasonably suggested that contact between go-karts during a race is anything other than just such a "commonly appreciated risk[ ]" of go-karting (*id.*). Consequently, the operator cannot be held to a duty to protect plaintiff from that risk, even if plaintiff herself failed to recognize the risk.

Since the operator of the track does not have a duty to protect the go-kart rider from the inherent and foreseeable risk of being bumped by another go-kart, no such duty to plaintiff will be deemed to have been created by the operator's rule prohibiting go-karts from intentionally bumping into other karts, or by its policy of stopping the race when bumping is observed (*see Sherman v Robinson*, 80 NY2d 483, 489 n 3 [1992]).

Plaintiff contends that defendants had a duty to inform her of the unforeseen risk to her arising from the fact that the passenger seat of the two-seater go-kart was intended for a child, not an adult, and that the child-sized dimensions of the passenger seat contributed to her injury. However, her submissions are insufficient to support the claim.

Plaintiff relies on the statement in the brochure for the two-seater go-kart that it was "introduced . . . to fill a demand . . . for a kart that could allow adult and child to share the karting experience." However, the vehicle's specifications indicate that the "footprint" of the two-seater is the same as that of the single-seat adult-sized go-kart. That the two-seater allows for a smaller-sized passenger is not the same as its having been designed to child-sized specifications. Indeed, the physical specifications for the company's child-sized model are smaller than those for the two-seater at issue here. Accordingly, there is no factual basis for the argument that Strike had an obligation to warn plaintiff that the two-seater's passenger section was not large enough for adults.

## Products Liability

Plaintiff also contends, in reliance on her expert's claims, that the go-kart was defective due to the presence of an unpadded metal hump on the floor over the front axle. She argues that it prevents an adult passenger from extending her feet

into the footwell, instead forcing the feet to be wedged against the metal hump, which leaves the legs unable to absorb any shock in the event of a collision. However, while plaintiff's expert claims a violation of ASTM standards regarding "Design of Seats" and "Passenger Clearances," he fails to establish that these standards are applicable to the design attribute of which plaintiff complains. Nor does plaintiff's expert controvert the assertion in the manufacturer's information that the go-kart in question "conforms to the newly adopted ASTM F 24.60 guidelines adopted by most states."

Plaintiff's expert's reliance on 12 NYCRR 45-6.9 (b), which requires "padding for component parts including but not limited to headrests and steering wheels," is misplaced. That the metal hump on the floor is unpadded is the equivalent of the floor being unpadded; it is not the type of "component part" to which the rule applies.

In sum, nothing in plaintiff's submissions tends to show that the go-kart was defective. Concur—Friedman, J.P., Sweeny, Saxe, Feinman and Clark, JJ.